**REDACTED VERSION**

# In the United States Court of Federal Claims

No. 09-15C
Filed: March 18, 2009
Reissued: April 8, 2009[*]

| | |
|---|---|
| BANNUM, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| DISMAS CHARITIES, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |

     Michael A. Gordon, Washington, DC, counsel for plaintiff. Fran Baskin, of counsel.

     Delisa M. Sanchez, with whom were Acting Assistant Attorney General Michael F. Hertz, Director Jeanne E. Davidson, and Assistant Director Deborah A. Bynum, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant. Dionis M. Gauvin, Bureau of Prisons, of counsel.

     Alex D. Tomaszczuk, Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, counsel for defendant-intervenor. Daniel S. Herzfeld and Caroline L. Plant, of counsel.

---

     [*] The court originally issued this order under seal on March 18, 2009, pursuant to the protective order entered in this case on January 21, 2009. After a review of the redactions proposed by the parties, the court is reissuing a redacted version of the order in conformance with the E-Government Act of 2002.

ORDER

DIRECTING DISMISSAL OF COMPLAINT

Plaintiff, Bannum, Inc., a disappointed bidder, is suing here to have the court declare unlawful and set aside a contract awarded to Dismas Charities, Inc., by the Federal Bureau of Prisons (the "BOP") for the operation of a community correctional facility in Montgomery, Alabama. The essence of plaintiff's complaint is that Dismas's selection as the successful offeror was the result of the BOP's improper application of the solicitation's award criteria. To succeed on its claim for declaratory and injunctive relief, plaintiff must demonstrate that (i) the award to Dismas was without justification in fact, that is, lacked any rational basis, or was erroneous as a matter of law, (ii) the relief requested is necessary to avoid irreparable harm, (iii) the balance of hardships argues in favor of granting relief, and (iv) the granting of relief will serve the public interest. PGBA, LLC v. United States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

The action is now before the court on the parties' cross-motions for judgment on the administrative record. The court heard oral argument on March 5, 2009. At the close of the argument, the court announced a tentative decision in defendant's favor but explained that before issuing a final ruling, it would further study the record in light of the arguments presented. For the reasons explained below, we now confirm our earlier ruling and grant defendant's and defendant-intervenor's motions for judgment on the administrative record.

I.

On October 14, 2005, the BOP issued a solicitation seeking proposals for the operation of a Community Correctional Center ("CCC" or "halfway house") in Montgomery, Alabama, to provide housing and rehabilitative services to individuals convicted of federal crimes soon to be released from imprisonment. The solicitation contemplated the award of a fixed-price requirements contract covering a two-year base period and three option years.

The solicitation provided that proposals would be evaluated in three areas: Past Performance, Technical/Management, and Price. Offerors were advised that Past Performance was more important than Technical/Management and that Technical/Management and Past Performance, when combined, were significantly more important than Price. The solicitation further explained that the evaluation of

2

Past Performance addresses "the Government's confidence in the offeror's probability of successfully performing the effort as proposed based on their record of performance in current and past relevant contract efforts." Offerors additionally were advised that the "Past Performance evaluation will be accomplished by reviewing aspects of an offeror's relevant present and recent past performance" in five designated areas: Accountability, Programs, Community Relations, Personnel, and Communications and Responsiveness. Moreover, offerors were placed on notice that the "recency and relevancy" of their Past Performance information would be critical to the government's evaluation and that in instances where the "relevant performance record indicates performance problems, the Government will consider the number and severity of the problems and the appropriateness of any corrective actions taken (not just planned or promised)."

Regarding the Technical/Management area, the solicitation specified five factors for evaluation: Site Location, Accountability, Programs, Facility, and Personnel. Site Location was the most important of these factors, followed next by Accountability, and then by the equally weighted Programs, Facility, and Personnel factors. Site Location was composed of two equally important subfactors: Site Validity and Suitability, and Community Relations Program. The solicitation also explained that the government would conduct a proposal risk assessment to determine "if any aspect of the proposed Technical/Management solution could pose potential adverse impacts on price, schedule or performance."

Offerors were advised that the BOP would assign a color/adjectival rating to each evaluated factor and subfactor and that these ratings would determine the overall ratings assigned to each of the evaluation areas. The color/adjectival definitions of relevance here are as follows:

> BLUE – Very Good: Offeror's proposal meets and exceeds the requirements of the solicitation. Their proposal shows they have a very good solution for meeting the needs and objectives of the program. One or more significant strengths exist. Weaknesses may exist, but none are considered significant and are easily correctable.

> GREEN – Acceptable: Offeror's proposal meets the . . . minimum requirements of the solicitation. Their proposal shows they have an acceptable solution for meeting the needs and objectives of the program. Strengths and weaknesses may exist. The weaknesses are correctable.

Offerors were further advised that upon receipt of proposals, the BOP would conduct site inspections of the offerors' proposed facilities which were to be "fully operational and ready for performance to begin within 120 days after the date of

contract award." Offerors also were advised that their evaluated price would be assessed against evaluation results of the non-price areas in conducting possible tradeoff analyses and determining "best value" to the government, with the offeror providing the "best value" to the government to be awarded the contract.

Two offerors submitted proposals in response to the solicitation—Dismas and plaintiff—each of whom had previously bid for and received substantially similar contracts. On July 18, 2008, the Source Selection Official issued a decision determining that award to Dismas represented the best value to the government.[1] The decision reflects that Dismas received a Past Performance rating of **[REDACTED]** and a Technical/Management rating of **[REDACTED]** with a **[REDACTED]** overall risk assessment, while plaintiff received a Past Performance rating of **[REDACTED]** and a Technical/Management rating of **[REDACTED]** with a **[REDACTED]** overall risk assessment. The breakdown of the evaluation is as follows:

| Source Selection Decision<br>July 18, 2008 | | |
|---|---|---|
| | DISMAS | BANNUM |
| Past Performance Area Overall Rating | [REDACTED] | [REDACTED] |
| Technical/Management Area Overall Rating | [REDACTED] | [REDACTED] |
| Site Location | [REDACTED] | [REDACTED] |
| Site Validity/Suitability | [REDACTED] | [REDACTED] |
| Community Relations | [REDACTED] | [REDACTED] |
| Accountability | [REDACTED] | [REDACTED] |
| Programs | [REDACTED] | [REDACTED] |
| Facility | [REDACTED] | [REDACTED] |
| Personnel | [REDACTED] | [REDACTED] |
| Risk Assessment | [REDACTED] | [REDACTED] |

---

[1] During the more than two and a half years that elapsed between the solicitation's initial issuance on October 14, 2005, and the July 18, 2008, award to Dismas now before the court, plaintiff filed several protest actions with the Government Accountability Office challenging the BOP's initial award and subsequent re-awards to Dismas. These earlier administrative actions are reported in Bannum, Inc., B-299149.6 (Dec. 4, 2008).

| Total Price | [REDACTED] | [REDACTED] |

II.

Plaintiff challenges the BOP's application of the solicitation's evaluation criteria and claims that these criteria were neither fairly nor correctly applied. The first criticism that plaintiff raises concerns the BOP's evaluation of Past Performance. Under the terms of the solicitation, an offeror was required to identify to the BOP, for its evaluation, five contracts, either public or private, that the offeror had performed within the immediately preceding three-year period and that involved a level of effort similar in size, complexity, and scope to that contemplated in the subject solicitation. In response to this requirement, plaintiff submitted information on five contracts that it had performed for the BOP, all involving the same or similar services to those being acquired in the instant solicitation. The BOP in turn surveyed the reported results of plaintiff's performance under these contracts and judged that effort, in the overall, to have been quite satisfactory, thus warranting a Past Performance rating of **[REDACTED]**.

Between the time plaintiff received the **[REDACTED]** Past Performance rating and the time the BOP reached its final decision, however, plaintiff was terminated for default by the BOP for failure of performance on a contract in **[REDACTED]** (not among the contracts previously identified by plaintiff), involving services similar to those addressed in the instant solicitation. The BOP's Source Selection Official took note of this termination and offered plaintiff the opportunity to address the circumstances that prompted it. Subsequently, in her award decision of July 18, 2008, the Source Selection Official again focused on this termination, calling it information that **[REDACTED]** and observing further that **[REDACTED]**.

It is the above-quoted language of the award decision that is the focus of plaintiff's attack. Plaintiff asserts that the issues that led to the default termination of the **[REDACTED]** contract—**[REDACTED]** that in turn delayed the commencement of contract performance—have no bearing on the performance to be undertaken in Montgomery, Alabama, under the instant contract. Plaintiff offers two arguments in support of this assertion. First, plaintiff claims that the Source Selection Official impermissibly expanded the scope of the Past Performance examination by introducing a default termination whose underlying facts do not relate to any of the solicitation's Past Performance criteria; second, plaintiff asserts that the problems that triggered the default termination in question are not present in Montgomery and therefore are not relevant to gauging the likelihood of successful performance of the instant contract. We consider these arguments below.

As to the first argument, plaintiff explains that the solicitation called for Past Performance to be evaluated in accordance with five operational areas of the contract's requirements:  Accountability, Programs, Community Relations, Personnel, and Communications and Responsiveness. The termination for default, however, did not arise out of any of these specific areas of contract performance. Rather, the termination arose out of an **[REDACTED]** that ultimately rendered the timely commencement of performance impossible. As plaintiff sees it, therefore, the termination for default involved an aspect of the work that was simply outside the framework by which Past Performance was to be evaluated. In departing from the solicitation's prescribed Past Performance evaluation criteria, plaintiff contends, the Source Selection Official subjected plaintiff's offer to an impermissible evaluation scheme. In support of this contention, plaintiff relies on the Federal Acquisition Regulations ("FAR"), specifically 48 C.F.R. (FAR) § 15.303(b)(4) (2008), which prescribes as a rule of federal procurement law "that proposals [be] evaluated based solely on the factors and subfactors contained in the solicitation."

We cannot accept this argument. Plaintiff offers a much too narrow view of the default termination. The termination, properly considered, was not synonymous with an isolated deficiency in performance. Rather, a default for failure to commence performance is necessarily a default in every aspect of the promised performance; it cannot logically be regarded as anything less. The Source Selection Official was therefore well within her authority, as defined by the solicitation's Past Performance criteria, in taking the **[REDACTED]** default termination into account.

Turning to plaintiff's second argument, the contention is that the **[REDACTED]** that plaintiff proposed to **[REDACTED]** that delayed performance in **[REDACTED]**. But, adds plaintiff, **[REDACTED]**, the 120-day "get-ready" period allowed by the solicitation was **[REDACTED]**. In short, plaintiff maintains that the **[REDACTED]** termination is simply not relevant to the Montgomery contract.

This too is an argument we cannot accept. The purpose of a past-performance evaluation is to assess the likelihood of an offeror's successfully accomplishing the tasks it is promising to undertake by examining how well it has accomplished similar tasks in the past. In that context then, an offeror's recently experienced default termination on an essentially identical contract is certainly an event a prospective buyer would be expected to take into account, for the relevant concern in that circumstance is the managerial shortcomings suggested by the default termination; not, as plaintiff would have it, the immediate facts that may have precipitated the termination. Indeed, to claim otherwise is to say that the Source Selection Official must turn a blind eye to relevant information that reasonably can be seen to imperil a prospective offeror's ability to perform. This is not the law. FAR § 5.305(a)(2)(ii) directs that in the conduct of a past-performance evaluation, the Source Selection

Official shall consider not only the performance history of the contracts identified by the offeror but also "information obtained from any other sources." Further, the regulation leaves it to the judgment of the Source Selection Official to "determine the relevance of [such] similar past performance information." The Source Selection Official therefore cannot be faulted for taking into account plaintiff's default termination and, based on that termination, expressing her diminished confidence in plaintiff's ability **[REDACTED]** by the promised performance date.

In addition to contending that its own **[REDACTED]** Past Performance rating was improperly discounted, plaintiff also contends that in the evaluation of Dismas's Past Performance, the BOP disregarded unfavorable information that, if taken into account, would have led to a lowered Past Performance rating for Dismas in the area of Community Relations. Specifically, plaintiff maintains that the Source Selection Official failed to acknowledge the less than amicable relationship that developed between Dismas and the city of Montgomery with respect to the site that Dismas had initially chosen for the location of its Montgomery facility.

According to plaintiff, Dismas ignored local opposition to the location of its facility (the proposed facility was to be located across the street from Troy University and the Rosa L. Parks Museum) and compounded this disregard by commencing site demolition work without a permit. These actions in turn prompted a stop-work order from the city and also a decision to schedule a hearing to determine whether then-current zoning requirements would support the selected site's intended use. Subsequently, Dismas was forced to bring suit against the city to compel a hearing on the zoning issue. The issue, when finally decided, went against Dismas, thus forcing it to seek further relief in court while at the same time prompting it to seek a new location for its proposed facility. Eventually, however, Dismas and the city entered into a "Settlement and General Release Agreement" under the terms of which the city agreed that "any changes in the City's Zoning Ordinance will not have the effect of disallowing the use of the Fleming Road Property [Dismas's new location] and building currently located thereon as a CCC, and City and City Parties will not contest the appropriateness of the zoning of the Fleming Road Property for a CCC, during the term or any extension(s) of Dismas' agreement with the Federal Bureau of Prisons to operate a CCC for federal offenders." On the basis of this settlement agreement, the Source Selection Official noted in her July 18 decision (included there as part of the Past Performance evaluation) that **[REDACTED]**.

The argument that plaintiff now makes is that Dismas's interactions with the city of Montgomery, when assessed in light of the facts described above, should have resulted in a rating of "Poor" in the area of Community Relations (one of the five factors comprising Past Performance) and, hence, in an overall Past Performance rating less rewarding than the **[REDACTED]** rating that Dismas did receive. Moreover, the **[REDACTED]** is, as plaintiff puts it, "irrelevant to Dismas' record

of 'acquiring and maintaining public support,'" i.e., irrelevant to the Community Relations aspect of Past Performance. Risk assessment, plaintiff asserts, is a component of the Technical/Management area of evaluation, not Past Performance. In sum then, plaintiff would have the court invalidate the BOP's determination assigning a [REDACTED] rating to Dismas's Community Relations record on the grounds that the determination failed to take into account all of the relevant facts and, at the same time, introduced an extraneous risk consideration.

The court cannot endorse this argument. The solicitation's instructions provide that with respect to the Community Relations factor, an offeror is to provide information regarding past or current relevant contracts that demonstrates the offeror's "record of performance and level of success in acquiring and maintaining public support for community corrections programs." Dismas provided such information and [REDACTED]. Based on the consistent record of [REDACTED] noted in the evaluation summary, the Source Selection Official concluded that Dismas [REDACTED]. It was in this same context that the Source Selection Official went on to say that in light of its settlement agreement with the city, [REDACTED].

Turning now to the facts that plaintiff stresses with respect to Dismas's dealings with the city of Montgomery, what emerges of importance is not the existence of a perhaps once-strained relationship between Dismas and the city but rather the reconciliation of differences that the parties achieved—a settlement agreement assuring the city's support of Dismas's correctional facility through the end of the contract period. It is this evidence of community support that caused the Source Selection Official to note that [REDACTED]. In sum then, the record, even when reviewed in terms of the facts emphasized by plaintiff, offers no bases for saying that Dismas offered the BOP an impaired history of community relations not deserving of the [REDACTED] Past Performance rating it was given.

Moving on, we next address the arguments plaintiff raises regarding the BOP's evaluation of the offerors' respective proposals in the solicitation's Technical/Management area. More particularly, plaintiff maintains that its proposal deserved higher ratings in the areas of Site Location and Accountability. The failure to receive these higher ratings, argues plaintiff, bespeaks administrative arbitrariness. The court disagrees. The Site Location factor addresses essentially two concerns: (i) the offeror's legal authority to operate a correctional facility at the proposed site (identified in the solicitation as the Site Validity and Suitability subfactor), and (ii) the plans and programs to be pursued by the offeror to maintain public acknowledgment and support of the correctional facility at the proposed site (identified in the solicitation as the Community Relations Program subfactor). Plaintiff's argument focuses on the second of these subfactors, the Community Relations Program.

With respect to the Community Relations Program, the solicitation directs offerors to provide documentation demonstrating (i) a community relations plan describing the approach for educating and interacting with the local community, (ii) law enforcement and local government awareness of the proposed operation of the community correctional facility, and (iii) community support or acknowledgment of the location of the proposed site. In response to this documentation requirement, plaintiff submitted, inter alia, **[REDACTED]**. Although only one of these **[REDACTED]**, plaintiff nevertheless contends, essentially on the collective strength of its community support letters, that it should have received a **[REDACTED]** rating in the Community Relations Program subfactor rather than the **[REDACTED]** rating it did receive. This court, however, can find no fault in the BOP's evaluation. Given the limited emphasis on community support or acknowledgment of the proposed site of plaintiff's facility demonstrated in plaintiff's documentation, it was certainly not unreasonable for the Source Selection Official to conclude that plaintiff's proposal **[REDACTED]**.

Next, plaintiff contends that it should have received a higher rating in the Technical Management area's Accountability factor. With respect to Accountability, the solicitation calls upon an offeror to provide an "Offender Accountability Plan that describes the plans, procedures, and practices [it] will employ to ensure that offenders are accurately accounted for while (1) in the facility; (2) at work assignments; (3) in all other activities outside the facility; and (4) under home confinement." In response to this requirement, plaintiff proposed the use of several security procedures, including a **[REDACTED]**. The Source Selection Official awarded this proposed **[REDACTED]**. She went on to say that **[REDACTED]**.

Plaintiff argues that it was unreasonable for the Source Selection Official to construe the use of the word **[REDACTED]** in plaintiff's proposal as a limitation on **[REDACTED]**. Plaintiff maintains that when read in context, the language clearly was intended to describe **[REDACTED]**. Indeed, with regard to this last point, plaintiff explains that in its proposal it **[REDACTED]**. According to plaintiff then, the Source Selection Official's decision to **[REDACTED]** in plaintiff's Accountability factor because of a lack of **[REDACTED]** is a decision without justification in fact.

We are not persuaded by plaintiff's argument. The Source Selection Official was correct in noting that plaintiff **[REDACTED]**—an observation plaintiff does not dispute. Hence, the issue comes down to whether the Source Selection Official could reasonably distinguish between a proposal deserving a "Very Good" rating, in contrast to an "Acceptable" rating, by looking to what the offeror was **[REDACTED]**. Such a distinction surely cannot be regarded as arbitrary; it is grounded in fairness and common sense.

Plaintiff insists, however, that Dismas too had described one of its proposed security features—[REDACTED]—in terms of its [REDACTED], yet, unlike plaintiff, was awarded a [REDACTED] for this system by the BOP. Plaintiff insists, therefore, that the Source Selection Official's decision is marred by lack of fair judgment. Again, we disagree. The short answer to this contention is that while Dismas's proposal, as plaintiff points out, did say that [REDACTED], the proposal also noted the [REDACTED]. Based on this language, the Source Selection Official had a legitimate basis for distinguishing between the offerors' respective security system proposals by going beyond the [REDACTED].

The final matter that we address is plaintiff's contention that the BOP has pursued a deliberate policy of favoritism toward Dismas. More particularly, plaintiff points out that while it has twice successfully challenged the BOP's award to Dismas in proceedings before the Government Accountability Office, in each instance, the corrective action undertaken—the reevaluation of proposals—led to a reaffirmation of the award to Dismas. In these "successive" awards to Dismas, argues plaintiff, the BOP pursued a less than even-handed role directed essentially to denying plaintiff the contract award. Specifically, plaintiff points to the following actions of the BOP:

(i) conducting a Past Performance evaluation that did not take into account all of the facts bearing on Dismas's record of community relations (and thus, according to plaintiff, avoiding facts that reflected poorly on that record);

(ii) appearing before the Montgomery city counsel to address issues concerning Dismas's proposed correctional facility (hence, in plaintiff's view, assuming an advocate's role on Dismas's behalf);

(iii) withholding the issuance of a "cure" notice to Dismas when that organization became unable to commence contract performance because of an adverse zoning ruling (thus, as plaintiff sees it, shielding Dismas from the certainty of a default termination);

(iv) defending against a protest lodged by plaintiff in the instant solicitation that involved an issue identical to that which had previously been resolved against the BOP in a related protest action (ostensibly to gain Dismas more time to ready its facility); and

(v) declining plaintiff's request to extend the schedule for the submission of required proposal revisions (a denial plaintiff maintains worked in Dismas's favor).

Plaintiff insists, however, that Dismas too had described one of its proposed security features—**[REDACTED]**—in terms of its **[REDACTED]**, yet, unlike plaintiff, was awarded a **[REDACTED]** for this system by the BOP. Plaintiff insists, therefore, that the Source Selection Official's decision is marred by lack of fair judgment. Again, we disagree. The short answer to this contention is that while Dismas's proposal, as plaintiff points out, did say that **[REDACTED]**, the proposal also noted the **[REDACTED]**. Based on this language, the Source Selection Official had a legitimate basis for distinguishing between the offerors' respective security system proposals by going beyond the **[REDACTED]**.

The final matter that we address is plaintiff's contention that the BOP has pursued a deliberate policy of favoritism toward Dismas. More particularly, plaintiff points out that while it has twice successfully challenged the BOP's award to Dismas in proceedings before the Government Accountability Office, in each instance, the corrective action undertaken—the reevaluation of proposals—led to a reaffirmation of the award to Dismas. In these "successive" awards to Dismas, argues plaintiff, the BOP pursued a less than even-handed role directed essentially to denying plaintiff the contract award. Specifically, plaintiff points to the following actions of the BOP:

(i) conducting a Past Performance evaluation that did not take into account all of the facts bearing on Dismas's record of community relations (and thus, according to plaintiff, avoiding facts that reflected poorly on that record);

(ii) appearing before the Montgomery city counsel to address issues concerning Dismas's proposed correctional facility (hence, in plaintiff's view, assuming an advocate's role on Dismas's behalf);

(iii) withholding the issuance of a "cure" notice to Dismas when that organization became unable to commence contract performance because of an adverse zoning ruling (thus, as plaintiff sees it, shielding Dismas from the certainty of a default termination);

(iv) defending against a protest lodged by plaintiff in the instant solicitation that involved an issue identical to that which had previously been resolved against the BOP in a related protest action (ostensibly to gain Dismas more time to ready its facility); and

(v) declining plaintiff's request to extend the schedule for the submission of required proposal revisions (a denial plaintiff maintains worked in Dismas's favor).

These various actions, plaintiff insists, were calculated to provide Dismas with a competitive edge and therefore reveal a bias on the part of the BOP that impaired the integrity of the bid evaluation process and rendered the award to Dismas void.

We reject plaintiff's argument. Plaintiff has offered the court no evidence to support the claim of ill motive that it attributes to the BOP's actions. And standing alone, these actions cannot satisfy the standard of "well-nigh irrefragable" proof that a party must meet to overcome the presumption of good faith that the law accords to the actions of government officials. Kalvar Corp. v. United States, 543 F.2d 1298, 1301–02 (Ct. Cl. 1976). To put it plainly, the court cannot assume, simply on the basis of plaintiff's "say-so," that the BOP's actions were inspired by no other purpose than to deny plaintiff a contract award. Short of compelling proof of wrongdoing, plaintiff's argument cannot prevail.

## CONCLUSION

Although plaintiff has argued its case forcefully and well, it has not been enough to persuade the court that the BOP's award decision to Dismas was not the product of reasoned decisionmaking. To the contrary, the court considers the Source Selection Official's decision to be well supported in fact, honestly arrived at, and correct as a matter of law. Accordingly, plaintiff's motion for judgment on the administrative record is DENIED and defendant's and defendant-intervenor's cross-motions are GRANTED. The clerk is directed to enter judgment dismissing plaintiff's complaint.

                                                            <u>s/John P. Wiese</u>
                                                             John P. Wiese
                                                             Judge